**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **DE'ON MOODY**<br>On behalf of himself and all others similarly situated,<br>　　　　　PLAINTIFF<br><br>V.<br><br>**ASSOCIATED WHOLESALE GROCERS INC.,**<br>　　　　　DEFENDANT | **CIVIL ACTION**<br><br>**CASE NO. 17-10290 "H" (4)**<br><br>**JUDGE:**<br>**JANE TRICHE MILAZZO**<br><br>**MAGISTRATE JUDGE:**<br>**KAREN WELLS ROBY** |

**MEMORANDUM IN SUPPORT OF DEFENDANT**
**ASSOCIATED WHOLESALE GROCERS, INC.'S**
**MOTION TO DECERTIFY COLLECTIVE ACTION**

Defendant, Associated Wholesale Grocers, Inc. ("Defendant" or "AWG"), hereby submits its memorandum in support of its Motion to Decertify Collective Action (the "Motion"). As set forth in more detail below, this collective action should be decertified, and the opt-in plaintiffs ("Opt-In Plaintiffs") dismissed because Plaintiff De'on Moody ("Plaintiff" or "Moody") cannot meet his burden of proving that he and the other members of this collective action are "similarly situated." There are numerous material differences between Plaintiff and the Opt-In Plaintiffs (collectively, the "Plaintiffs") that lead to the conclusion that the collective should be decertified, and the Opt-In Plaintiffs dismissed.

## INTRODUCTION

AWG operates a warehouse from which thousands of pallets of groceries are delivered to and shipped from each day. In order for AWG to operate efficiently and fulfill the demands of its customers, its warehouse operations require a high degree of coordination. That is where Plaintiffs come in: they supervise and coordinate the work of the many selectors, taggers,

loaders, and forklift drivers that work each shift.  Indeed, there were approximately 140 to 175 hourly employees working in roles such as selectors, taggers, loaders, and forklift drivers each day.  Without oversight and supervision, AWG's warehouse would descend into chaos.

Despite the important role that they play, Moody and the other members of this collective action take the incredulous position that they are mere manual laborers who do the same work as AWG's numerous hourly employees and that the oversight and supervision of the daily operations in AWG's just under one million square foot warehouse, with its 132 receiving and loading docks, and over one hundred employees fell to just five people in upper management.[1]  It is evidently clear that, in their own words, Plaintiffs testified to numerous, material differences between the members of the collective action.  These differences adversely impact Plaintiffs' assertion that they are exempt from overtime.  And, because of these differences, individualized analyses will be required, and collective action treatment is not appropriate.

This collective action should be decertified for the following reasons:

- First, within the main functional positions of the Plaintiffs, there are material differences regarding the job duties that will require an individualized analysis for each position;

- Second, even within the same job category, the testimony of the Plaintiffs differs with respect to what their job duties were, and this will require the Court to consider evidence for each Plaintiff;

- Third, several of the Plaintiffs performed unique jobs while holding the "Supervisor" title that are drastically different from other members of the collective action; and

- Fourth, there are Plaintiffs who are ineligible to participate in this collective action and the Court will have to analyze and determine whether they are proper Plaintiffs for this case.

---

[1]     As the Court will recall, at the conditional certification stage, Moody submitted a declaration to the Court that completely contradicted his deposition testimony.  Rec. Docs. 35-3.  *See also,* Rec. Doc. 43-1 (Memorandum in Support of Motion to Strike Declaration).  When conditionally certifying the class, the Court declined to strike the declaration.  Rec. Doc. 56.  AWG notes that, now that discovery is completed, the Court should not consider Moody's self-serving declaration.

## PROCEDURAL BACKGROUND

On October 7, 2017, Plaintiff Moody initiated this lawsuit pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* (the "FLSA").[2]  Specifically, Moody alleged that he and others similarly situated were misclassified as exempt from overtime and sought to recover unpaid overtime and other damages.  Moody, on October 31, 2017, filed his First Amended Complaint.[3]  Defendant answered and denied liability.[4]

Moody moved the Court to conditionally certify a collective action composed of "[a]ll individuals employed by AWG at any point from October 7, 2014 to the present, who held the position of supervisor in AWG's Pearl River facility."[5]  AWG opposed Moody's motion for conditional certification.[6]

The Court, on January 11, 2019, granted Moody's motion and conditionally certified a class composed of "all individuals employed by AWG from October 7, 2014 to the present who held the position of supervisor in AWG's Pearl River facility."[7]  The seventeen (17) Opt-In Plaintiffs filed written consents to join the collective action.[8]

This collective action is composed of Moody and the seventeen Opt-In Plaintiffs: Jermaine Bell, Kurt Bookhardt, Tonya Corwin, Ward Gonzales, Keith Ingraham, Scott Kinley, Antonio Robinson, Ronald Stout, Jeffrey Tait, Albert Troyani, Paul Weathersby, Ronald Wilson, Dana Womack, Drexell Ziegler, Darryl Taylor, William Bobbitt, and Rogest Montegue.[9]  Within this group, most of the Plaintiffs held multiple positions, including positions where they

---

[2]	Rec. Doc. 1.
[3]	Rec. Doc. 14.  It appears that Plaintiff's First Amended Complaint was filed in order to literally "fill in the blanks" that were present in his Complaint.
[4]	Rec. Doc. 23 & 24.
[5]	Rec. Doc. 35.
[6]	Rec. Doc. 42.
[7]	Rec. Doc. 56.
[8]	Rec. Docs. 2, 4, 6, 10, 15, 17, 18, 21, 25, 26, 30, 64, 65, 66, 67, 68, 69, 70, 73, and 74.
[9]	Rec. Docs. 2, 4, 6, 10, 15, 17, 18, 21, 25, 26, 30, 64, 65, 66, 67, 68, 69, 70, 73, and 74.

maintained their title of "Supervisor" but performed manager work.   The members of this collective action held the following positions:

| Position | Class Members |
|---|---|
| "Assistant Manager" | Moody |
| Grocery Side and Perishable Side Managers | Bookhardt, Tait |
| Training Supervisor | Moody |
| Inbound Supervisor | Moody, Bookhardt, Gonzales, Stout, Troyani, Tait, Bobbitt |
| Outbound Warehouse Supervisor | Gonzales, Bobbitt, Ingraham |
| Outbound Dock Supervisor | Bell, Kinley, Troyani, Weathersby, Robinson, Wilson, Womack, Ziegler, |
| Inventory Supervisor | Bobbitt |

Not only did several Opt-In Plaintiffs move between Inbound and Outbound positions, but several Plaintiffs (including Moody himself) held unique positions, such as "Assistant Manager" or "Training Manager," while being classified as a Supervisor.

## LEGAL STANDARD FOR DECERTIFICATION

The fundamental inquiry for the Court is whether the Plaintiffs are "similarly situated."[10] At the decertification stage, "the burden is on the plaintiff to prove that the individual class members are similarly situated."[11]   In considering whether decertification is appropriate, courts consider the following factors: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be

---

[10]      *Willis v. Behar*, No. 4:13-CV-3375, 2015 WL 12942481, at *6 (S.D. Tex. Dec. 14, 2015) ("At [the decertification stage], the burden is on the plaintiff to prove that the individual class members are similarly situated.").
[11]      *Id.*; *see also Snively v. Peak Pressure Control, LLC*, 314 F. Supp. 3d 734, 739 (W.D. Tex. 2018); *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 280 (N.D. Tex. 2008).

individual to each plaintiff; and (3) fairness and procedural considerations."[12]   The decertification stage is not "an opportunity for the court to assess the merits of the FLSA claims themselves by deciding factual disputes or making credibility determinations."[13]  If the Court determines that the Plaintiffs are not similarly situated, the Court must decertify the class and dismiss the Opt-In Plaintiffs' claims, leaving only Moody's original claims.[14]  "District courts retain significant discretion to manage collective action cases in a manner that promotes justice and judicial economy."[15]

It is clear that the differences among the Plaintiffs, as discussed in more detail below, require that the Court decertify this collective action and that it proceeds with Moody's claims only.

## ARGUMENT AND AUTHORITIES

The members of the collective are not similarly situated, therefore continued collective action treatment is inappropriate.  The differences between the Plaintiffs are evident in several different ways.   First, the job duties of the different types of Supervisors, *i.e.*, Inbound Supervisors, Outbound Warehouse Supervisors, and Outbound Dock Supervisors, differ to the point that a decision about one group cannot provide the basis for a decision about a different group.   Second, based on Plaintiffs' deposition testimony regarding their actual day-to-day duties, even within a single functional position, their duties differed to a degree that it impacts the analysis as to each Plaintiff's "primary duty" and whether a Plaintiff is exempt.  Third, some Plaintiffs performed unique or special job duties.   Fourth, there are some Plaintiffs who are ineligible to participate in this collective action because they do not meet the class definition and

---

[12]     *Snively*, 314 F. Supp. 3d at 739 (quoting *Falcon v. Starbucks Corp.*, 580 F.Supp.2d 528, 534 (S.D. Tex. 2008)).

[13]     *Clay v. Huntington Ingalls Inc.*, No. CV 09-7625, 2011 WL 13205917, at *3 (E.D. La. Sept. 29, 2011).

[14]     *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 916 n.2 (5th Cir. 2008).

[15]     *Nguyen v. Versacom, LLC*, No. 3:13-CV-4689-D, 2016 WL 6650860, at *6 (N.D. Tex. Nov. 9, 2016).

the Court will have to make individual analyses to determine whether or not they can continue as Plaintiffs.

AWG contends that Plaintiffs were properly classified as exempt pursuant to the executive exemption, administrative, and the combination exemptions.  These exemptions require the Court to analyze the Plaintiffs' actual day-to-day job duties in order to determine whether their "primary duty" satisfies an exemption.[16]  For the executive exemption, an employee's "primary duty must be managing the enterprise, or managing a customarily recognized department or subdivision of the enterprise."[17]  With respect to the administrative exemption, an employee's primary duty must be the performance of office or non-manual work related to the management or general business operations of the employer and this includes the exercise of discretion and independent judgment with respect to matters of significance.[18]  Further, pursuant to what is commonly referred to as the "combination exemption," an employee "whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption."[19]  Different exemptions may apply to different Plaintiffs, a hallmark reason for decertifying a collective action.

An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs."[20]  Determining an employee's primary duty "must be based on all the facts of a particular case, with the major emphasis on the character of the employee's job as a

---

[16]     *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 579 (E.D. La. 2008) (citing *Ale v. Tennessee Valley Authority*, 269 F.3d 680, 688-89 (6th Cir. 2001) (embracing principal that "courts must focus on the actual activities of the employee in order to determine whether or not he is exempt" as opposed to reviewing a vague job description)).  *See also*, *Kohl v. Woodlands Fire Dept.*, 440 F. Supp. 2d 626, 634 (S.D. Tex. 2006) ("The actual day-to-day job activities of the employee are relevant to determining whether employees are exempt … employees under the FLSA….").

[17]     29 C.F.R. § 541.100(a)(2).

[18]     29 C.F.R. § 541.200.

[19]     29 C.F.R. § 541.708.

[20]     29 C.F.R. § 541.700(a).

whole."[21]   The factors used to determine what is an employee's primary duty include:  the importance of the exempt duty(ies) as compared to the other duties performed by the employee; the amount of time that an employee spends doing exempt work; the employee's freedom from direct supervision; the relationship between the employee's salary and the wages paid to non-exempt employees for the kind of non-exempt work performed by the employee.[22]

**A. There are Substantial Differences Between the Plaintiffs That Are Evident by the Different Day-to-Day Job Duties Among the Various Functional Positions, the Varying Deposition Testimony of Plaintiffs Within a Functional Position, and the Unique Functional Positions Held by Several of the Plaintiffs.**

Looking at the disparate factual and employment settings of the individual Plaintiffs and the various defenses available to Defendant, it is clear this collective action should be decertified.

**1. The Duties Between the Three Main Function Positions—Inbound Supervisor, Outbound Dock Supervisor, and Outbound House Supervisor—Differ Significantly and Affect the Exemption Analysis.**

There are three main categories of jobs performed by Supervisors:  Inbound Supervisors, Outbound House Supervisors, and Outbound Dock Supervisors.  Each of these present different job duties that materially affect whether they are similarly situated and the exemption analysis. In particular, the job duties change drastically between the Inbound and Outbound Shifts.[23]

**a. The Inbound Supervisors.**

The inbound shift takes place between approximately 3 a.m. and 11 a.m. (the "Inbound Shift").[24]  During this shift, AWG employees receive shipments from vendors, coordinate the unloading of these shipments, and store the products in their proper locations within the

---

[21]     *Id.*
[22]     *Id.*
[23]     Deposition of Ward Gonzales, at pp. 25-27.  A copy of the Deposition of Ward Gonzales is attached as Exhibit A.
[24]     Declaration of Lloyd Faircloth, at ¶ 11.  The Declaration of Lloyd Faircloth is attached as Exhibit B.

7

warehouse.[25]   On the Inbound Shift, vendors deliver product to the warehouse and then are

unloaded by Capstone, a third-party service provider.[26]   AWG taggers (or receivers) then count

and label the product received and forklift drivers pick up the pallets and place them in the

proper racks in the warehouse.[27]   During the Inbound Shift, forklift drivers place approximately

22,000 to 24,000 pallets of product on the warehouse shelves every week.[28]   The Inbound

Supervisors are expected to "take control of their dock and unloading services, keep forklift

operators productive, [and] control damage and sanitation in the warehouse."[29]

The Inbound Supervisor has to do "a lot of coordinating with getting the trucks to the

doors," and then "deal with the schedule of the day as best as possible."[30]   After deciding which

truck will go to which loading bay, the Inbound Supervisor will call the truck drivers and instruct

them where to dock.[31]   The Inbound Supervisor makes this decision with an eye towards "what

their load consists of" and will then "put them in the best position [that] would maximize

productivity for the forklift operators by cut[ting] travel time."[32]

As the goods are unloaded and broken down by Capstone, the Inbound Supervisor is

responsible for supervising Capstone and ensuring that they are working quickly and accurately

and maintaining the cleanliness of the dock area.[33]   The Inbound Supervisor's job also requires

"constant coordination with . . . [Capstone] in regards to what's in the doors, what needs to be

offloaded, things of that nature."[34]   "[Q]uality is one of the highest priorities" and while on the

---

[25]       *Id.*
[26]       *Id.*
[27]       *Id.*
[28]       *Id.*
[29]       Deposition of Kurt Bookhardt, at Exhibit 6.   A copy of the Deposition of Kurt Bookhardt is attached as
Exhibit C.
[30]       Exhibit A, Gonzales Depo., at p. 28:7 – 9.
[31]       *Id.*, at p. 52:11 -13.
[32]       *Id.*, at pp. 52:24-53:4.
[33]       Exhibit B, Decl. of Lloyd Faircloth, at ¶¶ 17-24 and Exhibit 2 (Receiving Supervisor's Expectations).
[34]       Exhibit A, Gonzales Depo., at p. 54:9-12.

receiving dock, s/he "actually monitor[s] and observe[s] [and] [s/he] just coordinate[s] with [Captstone's] Site Manager or Supervisor any issues that [the Inbound Supervisor] sees quality wise."[35]

With respect to AWG personnel, the Inbound Supervisor supervises and manages taggers and forklift drivers.[36]  At the start of the shift, the Inbound Supervisor meets with the taggers and during this meeting s/he provides their paperwork for the shift and informs them of any issues or concerns for the day.[37]  During the course of the shift, the Inbound Supervisor keeps the taggers informed of anything that they need to look out for, such as recalls, and any discrepancies in the product that AWG receives.[38]

Later in the shift, the forklift drivers arrive, and the Inbound Supervisor meets with them to go over the schedule for that shift, safety issues, quality issues, and any other issues or problems that management determines needs to be addressed with the forklift drivers.[39]  There are as many as 30 to 35 forklift drivers on an Inbound Shift.[40]  Additionally, the Inbound Supervisors supervise the forklift drivers to ensure that they are carrying out their duties safely and in a timely and efficient manner.[41]

Inbound Supervisors are also required to perform audits of the pallets stored in the warehouse to confirm accuracy and that the product has not been damaged by the forklift drivers.[42]  At the end of the Inbound Shift, the Inbound Supervisor receives a printout of what

---

[35]     *Id.*, at p. 55:8-13.
[36]     *Id.*, at p. 28:4-7.
[37]     *Id.*, at p. 59:11-18.
[38]     *Id.*, at pp. 62:19-63:4.
[39]     *Id.*, at p. 64:5-65:4.
[40]     *Id.*, at p:67:14-22.
[41]     *Id.*, at pp. 41-42.
[42]     Deposition of Ronald Stout, at p. 68:6-18.  A copy of the Deposition of Ronald Stout is attached as Exhibit D.

each forklift driver was responsible for storing in the warehouse.[43]   The Inbound Supervisor would then check that the product was stored at the correct location.[44]

### b. The Outbound Supervisors.

The outbound shift occurs between approximately 2:30 p.m. and 10:30 p.m. (the "Outbound Shift").[45]   During this shift, AWG employees fulfill the orders placed by AWG's members by selecting the ordered products from their proper locations and palletizing them.[46] Different departments coordinate their work to ensure that members' orders are filled and then loaded onto trucks for delivery.[47]   On the Outbound Shift, order selectors (or just, selectors) comprise the majority of the workers.[48]   Selectors fill member orders by operating pallet jacks throughout the warehouse locating, selecting, and stacking on pallets the products that have been ordered.[49]   Selectors are guided through the warehouse by computer headsets to the proper rack location of the ordered product.[50]   Once they reach a proper location, selectors confirm that the proper selection has been made by speaking into the headset and then receiving instruction for the next location of ordered product.[51]   This process repeats until the customer's order has been selected, pulled from its location in the warehouse, and palletized.[52]   When members' orders are complete, selectors deliver the full pallet to the loading dock area.[53]

At the dock, loaders shrink wrap each palletized customer order and determine where the pallet is to be loaded on the delivery truck based on several logistical and safety factors,

---

[43]     *Id.*, Stout Depo., at p. 68:9-12.
[44]     Deposition of De'on Moody, at pp. 79; 91.  The Deposition of De'on Moody is attached as Exhibit E.
[45]     Exhibit B, Decl. of Lloyd Faircloth, at ¶ 12.
[46]     *Id.*
[47]     *Id.*
[48]     *Id.*
[49]     *Id.*
[50]     *Id.*
[51]     *Id.*
[52]     *Id.*, at ¶ 14.
[53]     *Id.*

including the particular truck's delivery route, the weight of each order, the height of the order, and the size and shape of the truck.[54]  Forklift operators on the Outbound Shift assist both with the loading process and moving pallets of goods down from the upper racks in the warehouse to replenish locations where goods have been depleted.[55]  During the Outbound Shift, AWG's employees move approximately 850,000 cases of product to the loading and receiving docks and onto trucks for delivery to AWG's member stores on a weekly basis.[56]

For the Outbound Shift, the Supervisors are broken down into two different functional positions:  House Supervisors and Dock Supervisors.  The job duties of the Outbound Supervisors differ drastically from those of the Inbound Supervisors, and the responsibilities of the House Supervisors and Dock Supervisors differ as well.

### i.  The House Supervisors.

The Outbound House Supervisors supervise forklift drivers and her/his primary duty is to coordinate the work of these forklift drivers in order to prevent "chase outs."[57]  A "chase out" is when a selector arrives at a certain location to collect product to place on a pallet for a customer, but there is insufficient product or no product at that location.  In that case, the selector moves on to get the rest of the order and another selector has to go back and "chase" the product to complete the original order.

The Outbound House Supervisors constantly monitor the computer system for chase outs recorded by selectors.  He/she then coordinates forklift drivers to make sure that product is moved to that specific location in the warehouse so that there is sufficient product for the selector

---

[54]      *Id*.
[55]      *Id*.
[56]      *Id*.
[57]      Deposition of Keith Ingraham, at p. 43.  A copy of the Deposition of Keith Ingraham is attached hereto as Exhibit F.

when s/he makes their next round.[58]  The Outbound House Supervisors are also constantly monitoring the status of the inventory at certain locations to prevent chase outs in the first place.[59]

With respect to this process, the Outbound House Supervisors prioritize certain chase-outs and direct the forklift drivers to complete some before others.[60]  The reason for this is to try to avoid congestion so that operations can continue in the most efficient manner possible.[61]  Further, when a forklift driver finishes a section, the Outbound House Supervisors reallocate the forklift drivers to different zones.[62]  This is either to maintain efficiency and cut down on a forklift driver's travel time, or to assist other forklift drivers who are falling behind in their chase outs.[63]

Part of the Outbound House Supervisors' responsibility is also to reallocate resources to make sure that chase outs are being resolved quickly.  If the Outbound House Supervisors does not ensure that chase outs are being quickly resolved, this will impact the selectors and delay their work.  If there is no product or insufficient product in the warehouse, the selector cannot finish a pallet.  This, in turn, delays getting the pallet to the loading bays which then delays the loading of the trucks.  The delay in loading the trucks prevents the trucks from leaving on time and ultimately negatively impacts AWG's customers.  In sum, if the Outbound House Supervisors fails to sufficiently supervise and manage her/his portion of the operation, this has a cascading effect delaying all the work of the Outbound shift.

---

[58]     *Id.*, at pp. 37-38.
[59]     *Id.*, at p. 43.
[60]     *Id.*, at pp. 43-44.
[61]     *Id.*, at pp. 43-44.
[62]     *Id.*, at p. 49.
[63]     *Id.*, at p. 50.

### ii.  The Dock Supervisors.

For the Outbound Shift, the Dock Supervisors start their shift by preparing the paperwork for the loaders.  The Dock Supervisors then meet with the loaders and hand out their assignments for that shift.[64]

While on the dock, the Dock Supervisors oversee the loaders in the specific zone that he/she covered.  The Outbound Dock Supervisors are responsible for the timely loading of the product onto the trailers to ensure that the loaders (and others) perform their jobs safely, and that the product is not damaged.[65]  This is the primary duty of the Outbound Dock Supervisors.[66]  If the loaders have any issues or problems, they go to the Outbound Dock Supervisors to discuss and have it resolved.

When a load is completed, it is the Outbound Dock Supervisors' responsibility to close out the load.  Specifically, the Outbound Dock Supervisors check the last few pallets that are loaded into the truck to ensure that they have been wrapped properly and are in good condition.  At that point, the Outbound Dock Supervisors close the truck and coordinate having it moved from the dock into the staging yard.

In addition to these duties, the Outbound Dock Supervisors are required to perform audits of the pallets in order to check that the selector has properly loaded the pallet per the instructions.[67]  At the end of each shift, it is the Outbound Dock Supervisors' responsibility to

---

[64]    Deposition of Roland Wilson, at pp. 32-33.  A copy of the Deposition of Roland Wilson is attached as Exhibit G.
[65]    *Id.*, at pp. 61-64.
[66]    Deposition of Paul Weathersby, at pp. 23 and 43.  A copy of the Deposition of Paul Weathersby is attached as Exhibit H.
[67]    *Id.*, at pp. 38-40.

make sure that the loaders have cleaned their area of the dock and, if they did not do so, make sure it is done.[68]

Based on these disparities in responsibility between Inbound and Outbound Supervisors, and among Outbound supervisors, at a bare minimum, the Court must perform three separate analyses with respect to the different job duties and functional job positions of the Plaintiffs. It is not enough to just say that all the Plaintiffs are "Supervisors." Their actual job duties differ based on whether they worked the Inbound or Outbound Shift and, within the Outbound Shift, whether they were Dock Supervisors or House Supervisors. These are exactly the kind of differences that warrant decertification as these differences go to the heart of AWG's exemption defenses and will require individual analysis.

### 2. Even Within a Single Functional Job, Plaintiffs' Deposition Testimony Shows that There Are Substantial Differences Among Their Duties That Will Require Plaintiff-by-Plaintiff Analysis.

The deposition testimony of the Plaintiffs in this collective action clearly demonstrates that there are substantial differences between Plaintiffs within each of the functional job categories and this will require the Court to engage in individualized analyses. These differences are material to the exemption analysis and not mere distinctions without a difference. As a result, the Court will need to perform an individualized analysis of each of the Plaintiffs in order to determine whether they are exempt.

The differences in the actual day-to-day job duties are best highlighted by the testimony of Jermaine Bell and Scott Kinley. Bell and Kinley held the position of Outbound Dock Supervisor at AWG's Pearl River facility.[69] Despite this similarity in functional position, Bell

---

[68]     *Id.*, at pp. 38-39, 43.
[69]     Deposition of Jermaine Bell, at p. 26:4-12. A copy of the Deposition of Jermaine Bell is attached as Exhibit I; Deposition of Scott Kinley, at p. 19:11-13. A copy of the Deposition of Scott Kinley is attached as Exhibit J.

and Kinley's deposition testimony reveals that their primary duties as Outbound Dock Supervisors were substantially different and require individualized analysis.

### a. The Testimony of the Outbound Dock Supervisors is Inconsistent with Respect to the Amount of Manual Labor They Performed.

First, although Bell and Kinley contend that they were both manual workers as Outbound Dock Supervisors, their deposition testimony as to whether their primary duty involved the performance of non-manual labor greatly differed. Bell testified that his primary duty was to get trucks loaded by simply informing the loaders if something was missing and physically loading the trucks himself.[70] Bell further claimed that his duties as an Outbound Dock Supervisor were no different from when he was loader because he was still physically loading trucks much of the time.[71] In fact, Bell testified that as a Dock Supervisor, he would at times load a truck from start to finish by himself.[72] Bell asserted that he would spend three to four hours per night loading trucks as a Supervisor and some nights he would do nothing but load trucks.[73] But, Bell also stated that he was one of the only Supervisors performing manual loading.[74] Bell further testified that due to favoritism, some Supervisors were allowed to sit up in the office while others had to be out on the floor.[75] Bell testified that as a result, he was often burdened with the duties of both a Warehouse Supervisor and a Dock Supervisor.[76]

On the other hand, Kinley testified that once he became an Outbound Dock Supervisor, he no longer physically loaded trucks and Lloyd Faircloth (the Warehouse Supervisor)

---

[70]     Exhibit I, Bell Depo., at pp. 157-58. *See also*, Exhibit H, Weathersby Depo., at pp. 58-60 (stating that he unloaded and loaded trailers on a daily basis); Deposition of Antonio Robinson, at pp. 94-98 (testifying that he did the same work as an hourly employee but eventually minimized his manual labor). A copy of the Deposition of Antonio Robinson is attached as Exhibit K.
[71]     Exhibit I, Bell Depo., at pp. 37-39, 85-88.
[72]     *Id.*, at pp. 53-55.
[73]     *Id.*, at pp. 50-52.
[74]     *Id.*, at pp. 37-39, 85-88.
[75]     *Id.*, at pp. 130-31.
[76]     *Id.*, at pp. 82, 119, 122.

specifically told him not to perform any loading.[77]  Kinley's position as a Dock Supervisor was to actually supervise and observe the dock to make sure things moved in a timely manner.[78] According to Kinley, when he became a dock supervisor, his job duty was "paperwork basically."[79]

The amount of manual labor an employee performs is a key issue with respect to AWG's exemption defenses.  For example, the administrative exemption that AWG will rely on requires that the employee's primary duty involve "the performance of . . . non-manual work."[80]  These differences in testimony show that a blanket decision with respect to the class cannot be made based on the testimony of a few Plaintiffs.

**b. The Deposition Testimony is Inconsistent with Respect to the Amount of Discretion and Supervisory Authority the Plaintiffs Possessed.**

In addition, Bell and Kinley's testimony reveal discrepancies in the amount of supervisory authority and discretion each claimed to have as Outbound Dock Supervisors.  First, Bell testified that he had no authority to discipline or instruct the loaders; he simply gave the loaders their paperwork.[81]  In fact, Bell alleged that loaders were basically their own supervisors.[82]  If something was damaged on the back of the truck, Bell claimed he did not have the authority to do anything about it.[83]  Bell also denied that if a store received damaged product,

---

77      Exhibit J, Kinley Depo., at p. 63.).  *See also*, Deposition of Albert Troyani, at p. 70 (stating that he loaded trucks "5 or 6 times" in the year and a half he was an Outbound Dock Supervisor).  A copy of the Deposition of Albert Troyani is attached as Exhibit L.

78      *Id.*, at p. 76.

79      *Id.*, at p. 84:1-9.

80      29 C.F.R. § 541.200.

81      Exhibit I, Bell Depo., at pp. 56-58.

82      *Id.*, at pp. 82, 85-88.  Even though all the Plaintiffs were uniformly classified as "Supervisors," their testimony regarding their day-to-day routines differs from each other and is sometimes inconsistent with AWG's prescribed duties that resulted in the classification of the Plaintiffs.  *Lipnicki v, Meritage Homes Corp.*, 2014 WL 5620603, at *3 (S.D. Tex. Nov. 4, 2014).

83      *Id.*, at p. 61.

16

other than the last four pallets, he would not have been held responsible; rather, the loader would have been responsible.[84]

Kinley, on the other hand, testified that he supervised approximately eight or nine loaders, he would resolve any issues the loaders came to him with, and the loaders rarely did not follow his instructions.[85]  Kinley further testified that he was held accountable for his loaders and would be reprimanded for their poor performance, including if any of them improperly loaded a truck.[86]  If a load was not properly done, Kinley would instruct the loaders to rearrange the load.[87]

Second, Bell denied that he had the authority to instruct the loaders to clean the docks and stated that only managers had that power.[88]  In fact, Bell stated he never instructed a loader to clean the docks and the docks were only cleaned 2% of the time.[89]  However, Kinley testified that it was his responsibility to make sure the loaders cleaned the docks every night and if it was not done, he would speak with the loader.[90]  Kinley tried to make sure the docks were clean 80-90% of the time, and he testified that it was his responsibility to not let the loaders leave until the docks were clean.[91]

Bell also denied that it was his responsibility to make sure loaders were following special customer loading instructions.[92]  Bell further denied that he was responsible for counseling loaders if they were working slowly and affecting production; instead, Bell contended that he

---

[84]     *Id.*, at pp. 64, 69-70.
[85]     Exhibit J, Kinley Depo., at pp. 31, 33, 36, 71.
[86]     *Id.*, at pp 77.
[87]     *Id.*, at p. 35.
[88]     Exhibit I, Bell Depo., at pp. 71, 72.
[89]     *Id.*, at pp. 73-75.
[90]     Exhibit J, Kinley Depo., at p. 46.
[91]     *Id.*, at pp. 47, 58.
[92]     Exhibit I, Bell Depo., at p. 69.

would simply document the production and the Managers would counsel the loaders.[93] Kinley, on the other hand, admitted that it was his responsibility as Dock Supervisor to make sure special customer procedures were adhered to.[94] If the procedures had not been followed, Kinley would speak with the loader and make him/her reload the truck.[95] Again, Kinley testified that he was held accountable for his loaders and would be reprimanded for their poor performance.[96]

Furthermore, Bell denied that he had the authority to move loaders from one truck or zone to another, which he recognized as an important function in the overall operation.[97] Instead, Bell contended only Managers could make such moves.[98] Bell denied that he had any control over loaders in making dispatch times and that there was no expectation for him to talk to the loaders to facilitate a timely departure.[99] He also denied having any authority to direct a floater where to work, instead, Managers made that call.[100] Overall, Bell claimed that he had no independent discretion to decide whether to do or not do something;[101] rather, that was all left to management.[102]

Kinley, however, testified he would speak with underperforming loaders and ask them to "pick it up."[103] Kinley testified he would be involved in disciplinary actions for underperforming loaders (along with management), and even completed two disciplinary write-ups.[104] Kinley also testified that as a Dock Supervisor, he directed floaters to assist certain

---

[93] *Id.*, at p. 80.
[94] Exhibit J, Kinley Depo., at p. 45.
[95] *Id.*, at pp. 35, 45.
[96] *Id.*, Kinley Depo., at p. 77.
[97] Exhibit I, Bell Depo., at pp. 43-46.
[98] *Id.*, at pp. 43-46.
[99] *Id.*, at p. 84.
[100] *Id.*, at pp. 91-92.
[101] *Id.*, at pp. 155-156.
[102] *Id.*, at pp. 155-156.
[103] Exhibit J, Kinley Depo., at p. 76.
[104] *Id.*, at p. 56.

loaders who were falling behind their expected work rate.[105] At the beginning of a shift, Kinley asked his best loaders to take the first few zones because the trucks in those zones needed to be loaded and closed out as soon as possible.[106]  While falling behind at any point resulted in a domino effect on the entire operation, falling behind at the beginning of the shift was especially problematic and important to avoid.[107]

### c. The Deposition Testimony Differs With Respect to the Supervisors' Quality Control and Safety Functions.

Part of the Supervisors' duties also involved a quality control function.  Again, the deposition testimony differs on this subject.  Kinley testified that the Outbound Dock Supervisors became responsible for auditing orders assembled by three different selectors.[108] Kinley would perform these audits and, if a selector's count was wrong, Kinley would speak with the Manager about the incorrect order.[109]  Bell, by contrast, stated that he performed audits "for a little over a month," but that he did not always do it because he was too busy.[110]  Likewise, Plaintiff Albert Troyani testified he performed audits of the selectors just "a few times."[111]

Further, some of the Supervisors had a quality control function inspecting the product that was being delivered.  For example, Plaintiff Ward Gonzales, as an Inbound Supervisor, testified that once product was unloaded from the truck, he would inspect it and determine if there were any quality issues with it.[112]  Likewise, Plaintiff Ronald Stout testified that as the product was unloaded from the truck, it was his job to inspect the product for damage, check that

---

[105]     *Id.*, at pp. 60-64, 76.
[106]     *Id.*, at pp. 28-29.
[107]     *Id.*, at pp. 28, 32.
[108]     *Id.*, at p. 43, Ex. 3.
[109]     *Id.*, at p. 44.
[110]     Exhibit I, Bell Depo., at p. 76.
[111]     Exhibit L, Troyani Depo., at p. 78.
[112]     Exhibit A, Gonzales Depo., at p. 56-60.

the product that was ordered was the product that arrived, and that the correct amount arrived.[113]
If product was damaged, Stout instructed Capstone to separate out the damaged product, delete it
from the "tag," and put it back on the truck.[114]

 For those Supervisors working on the perishable side of the Inbound Shift, their quality
control function was limited.  Plaintiff Jeffrey Tait testified that for the Supervisors on the
perishable side, there were "quality control" personnel and only they could reject product.[115]
Accordingly, Plaintiff Kurt Bookhardt testified that quality control was not his responsibility, but
rather that fell to the quality control personnel.[116]  However, despite disclaiming any quality
control role, Bookhardt did testify that he would reject product if it was damaged.[117]

 The Supervisors also had a safety role as part of their supervisory function.  Plaintiff
Dana Womack testified that he was responsible for safety and had to make sure "no one got run
over."[118]  Supervisors, according to Plaintiff Drexell Ziegler, were responsible for monitoring the
safe operation of the equipment.[119]  While everyone was responsible for safety, it was ultimately
the Supervisors' responsibility.[120]  But again, the testimony differs about how much effort a
specific Supervisor put into her/his safety responsibility.  Womack testified that he performed
"safety checks" on everyone that he supervised during his shift.[121]  Ziegler, however, testified
that he never instructed an employee about unsafe job operations.[122]  Further, Bell outright

---

[113] Exhibit D, Stout Depo., at p. 48.
[114] *Id.*, at p. 48.
[115] Deposition of Jeffrey Tait, at p. 21.  A copy of the Deposition of Jeffrey Tait is attached as Exhibit M.
[116] Exhibit C, Bookhardt Depo., at p. 28.
[117] *Id.*, at p. 29.
[118] Deposition of Dana Womack, at p. 35:7-10.  A copy of the Deposition of Dana Womack is attached as Exhibit N.
[119] Deposition of Drexell Ziegler, at p. 74:19-22.  A copy of the Deposition of Drexell Ziegler is attached as Exhibit O.
[120] Exhibit E, Moody Depo., at pp. 55-56.
[121] Exhibit N, Womack Depo., at p. 74:2-4.
[122] Exhibit O, Ziegler Depo., at pp. 67-68.

denied that he had any responsibility to counsel loaders or others about safety, rather it was "everybody's responsibility."[123]

As part of their safety function, Supervisors were required to hand out at least two "safety cards" each day.  A Supervisor would hand out a safety card to hourly employees who they observed violating safety rules or as a commendation for performing a task safely and correctly. While required to do so, some Supervisors, such as Tait, did not follow through with issuing safety cards because they were "too busy."[124]  Plaintiff Antonio Robinson, however, handed out at least one safety card every day when he was a Supervisor.[125]  Likewise, Plaintiff Keith Ingraham handed out safety cards to hourly employees.[126]

"Quality control" and "safety and health" are two of the items listed as possible administrative duties.[127]  As a result, this disparate testimony may result in different conclusions being reached with respect to the application of the administrative exemption to Plaintiffs in the same roles.

### d.   The Deposition Testimony Differs With Respect to Whether Plaintiffs Had Access to AWG's Timekeeping System and Could Adjust the Hourly Employees' Time Records.

Of the Opt-In Plaintiffs, eight of them had access to AWG's Kronos system that tracked the number of hours that the hourly employees whom they supervised worked.[128]  Those Plaintiffs who had access to Kronos could correct the hourly employees' time records.  For example, if an hourly employee forgot to clock-in at the beginning of their shift, the Supervisor

---

[123]    Exhibit I, Bell Depo., at pp. 99-101.
[124]    Exhibit M, Tait Depo., at p. 79:10-17.
[125]    Exhibit K, Robinson Depo., at pp. 51-55.
[126]    Exhibit F, Ingraham Depo., at pp. 39-40.
[127]    29 C.F.R. § 541.201(b)
[128]    Declaration of Floyd Baker, at ¶ 6 and Exh. 1.  A copy of the Declaration of Floyd Baker is attached as Exhibit P.

with access to Kronos could correct that error.  Again, the testimony regarding whether these Plaintiffs utilized their authority to correct the hourly employees' time records differs.

Bookhardt, for example, testified that he did have access to the Kronos system and could adjust an hourly employees' hours worked.[129]  However, he claims that, before doing so, he had to get permission from the Shift Manager.[130]  Tait testified that while he had access to Kronos he never adjusted the hourly employees' hours because he was "just too busy to do that."[131]  Stout, Ingraham, and Wilson, who according to AWG's records had access to the Kronos system, testified that they did not have access to Kronos.[132]

Moody, however, not only had access to the Kronos system, but admitted that he would approve the hourly employees' hours for the week.[133]  Moody would review when the hourly employees clocked in and out and approve the entries.[134]  If the hours looked incorrect, for example, if an employee forgot to clock out, Moody would have to research and figure out the correct number of hours worked for that day for that employee and update the records accordingly.[135]  If an employee forgot to clock-in, Moody would again investigate and try to figure out what time that employee started working on a particular day.[136]

As set forth in the applicable regulations, these types of activities may qualify as work directly related to the general business operations of the Plaintiffs' employer.[137]  The differing testimony from those Plaintiffs who had access to the Kronos time systems varies to a degree

---

[129]     Exhibit C, Bookhardt Depo., at p. 53.
[130]     *Id.*, at p. 53.
[131]     Exhibit M, Tait Depo., at p. 53:5-7.
[132]     Exhibit D, Stout Depo., at p. 78; Exhibit F, Ingraham Depo., at p. 68:10-16; Exhibit G, Wilson Depo., at p. 62:12-16.  Exhibit P, Decl. of Floyd Baker, at ¶ 6 and Exh. 1.
[133]     Exhibit E, Moody Depo., at p. 56:8-16.
[134]     *Id.*, at p. 56:17-23.
[135]     *Id.*, Moody Depo., at p. 57:4-7.
[136]     *Id.*, Moody Depo., at pp. 57:24-59:3.
[137]     29 C.F.R. § 541.301(b) (noting that personnel management is an example of work directly related to management or general business operations).

that representative evidence will be unable to establish whether this was a "primary duty" for all Plaintiffs.  This further supports the conclusion that this collective action should be decertified.

### 3. Several Plaintiffs Worked Different Functional Positions While Holding the "Supervisor" Job Title and Each of These Plaintiffs Will Require Multiple Analyses Regarding His Primary Duties.

During the relevant time periods, four of the members of this collective action, Plaintiff De'on Moody, Kurt Bookhardt, Jeffrey Tait and William Bobbitt, worked unique jobs that were different from the "typical" positions filled by Supervisors.  As such, each one of these different sets of jobs requires a separate, individualized analysis.

#### a. Moody Worked Three Vastly Different Positions During His Recovery Period and Each One Requires a Separate Analysis.

Moody, the named Plaintiff, provides a perfect example of the reason why this collective action should be decertified.  During the relevant time frame, Moody held at least *three* different functional positions while his job title was "Supervisor" and each one had very different job duties.  As a result, a separate analysis is required for each of these different functional job titles.

##### i. From October 2014 until June 2015, Moody Worked as an Inbound Supervisor.

Moody worked as an Inbound Supervisor for the period of October 2014 until June 2015.[138]  As previously noted, the Inbound Shift takes place between approximately 3 a.m. and 11 a.m..[139]  During this shift, AWG employees receive shipments from vendors, coordinate the unloading of these shipments, and store the products in their proper locations within the warehouse.[140]  On the Inbound Shift, vendors deliver product to the warehouse and then are unloaded by Capstone, a third-party service provider.[141]  AWG taggers (or receivers) then count

---

[138]     *Id.* at Depo. Ex. 2 (Moody Resume, MOODY000006-07).
[139]     Exhibit B, Decl. of Lloyd Faircloth, at ¶ 12.
[140]     *Id.*
[141]     *Id.*

and label the product received and forklift drivers pick up the pallets and place them in the proper racks in the warehouse.[142]  During the Inbound Shift, forklift drivers place approximately 22,000 to 24,000 pallets of product on the warehouse shelves per week.[143]

In this position Moody "[s]upervised multiple employees, . . . verified all UPCS, label[ed] all incoming product, then over[saw] the proper placement of the merchandise within the warehouse by conducting aisle audits."[144]  As the Inbound Supervisor, Moody supervised at least two forklift drivers.[145]  For example, if Moody saw a forklift driver "bs-ing" or standing around, Moody would put that individual to work.[146]

Additionally, Moody made sure that the forklift drivers took the correct product and then placed that product in the correct location in the warehouse.[147]  In order to make sure this occurred, Moody would conduct aisle audits.[148]  When he performed an aisle audit, Moody would get a print-out of what product should be located in a specific aisle, and then check to make sure that the product was where it was supposed to be.[149]  If it was incorrect, Moody saw that it was corrected.[150]  Thus, Moody had the independence and authority to discipline and counsel employees to make sure they were doing their work and doing it properly.

---

[142]    *Id.*
[143]    *Id.*
[144]    Exhibit E, at Depo. Ex. 2 (Moody Resume, MOODY000006-07).
[145]    *Id.*, at pp. 76-78.
[146]    *Id.*, at pp. 80-81.
[147]    *Id.*, at p. 78.
[148]    *Id.*, at pp. 78-79.
[149]    *Id.*, at pp. 78-79.
[150]    *Id.*, at pp. 78-79.  Exhibit B, Declaration of Lloyd Faircloth at ¶ 4.

### ii. From June 2015 Until July 2016, Moody Worked as the "Warehouse Training Supervisor."

Moody's second functional position was as the "Warehouse Training Supervisor" from June 2015 until July 2016.[151]   The Warehouse Training Supervisor position involved substantially different day-to-day job duties from the other Supervisor positions.  In his role as the Warehouse Training Supervisor, Moody was responsible for analyzing the job performance of probationary employees.  Specifically, Moody would analyze the performance of production employees in their first ten (10) weeks of employment and consult with these employees (and their managers) in order to find ways to improve their productivity and performance.[152]  Moody would also observe probationary period production employees carrying out their job duties on a daily basis and would provide feedback, advice, and input so that such employees could improve their performance and meet their production quotas.[153]   In addition to providing feedback to these probationary production employees, Moody would actually provide training to probationary employees who needed it.[154]  Moody also made recommendations to management regarding the performance of the probationary production employees, up to and including, recommendations that certain probationary employees should be terminated due to their poor performance.[155]

---

[151]    Exhibit E, at Depo. Ex. 2 (Moody Resume, MOODY000006).  Plaintiff Moody is the only member of the collective to hold the "Warehouse Training Supervisor" position, which he held from approximately June 2015 until July 2017.  *See also*, Exhibit B, Decl. of Lloyd Faircloth, at ¶ 49.

[152]    Exhibit E, Moody Depo., at pp. 92:17-94:15 ("They would say my stacking is hard or whatever, and then I would have to get with the – the manager on duty, discuss if we had extra bodies to be able to help these guys with stacking, you know, and if – if you didn't have the right people, then, you know, I would just have to go and try to walk behind them and, say, help them out.").

[153]    *Id.*, at pp. 94:16-95:8.

[154]    *Id.*, at p. 104:10-22.

[155]    *Id.*, at pp. 106-107.

In addition to the training and evaluation duties, Moody also performed random, supervisory tasks as the Warehouse Training Supervisor.[156]  Such tasks would include being asked to check on the progress of the production employees and find out why certain operations were not as far along as they should be, pulling additional resources and reassigning them in order to have certain operations progress at their expected pace, checking the product in the warehouse to look for damaged items, and checking to ensure that the warehouse was properly cleaned.[157]  In essence, if a situation arose, Moody would be asked to figure out what was going on and assist in resolving any issues.[158]

Moody himself testified that he believed that the position of Warehouse Training Manager was *sui generis* and was "made up" uniquely for him.[159]  Moody is the only member of this collective action to hold the functional position of "Warehouse Training Supervisor."

### iii.   From July 2016 Until July 2017, Moody Worked as the "Assistant Manager."

Moody's *third* functional position was as the "Assistant Manager."  At the time Moody was performing this work, he referred to the position as the "Warehouse Outbound Supervisor," and he filled this role from approximately July 2016 until the end of his employment with AWG in July of 2017.[160]  During this period, Moody was the "only" Warehouse Outbound Supervisor working and, according to Moody himself, he was "doing ten times as much work" as other outbound supervisors.[161]  In essence, Moody was supervising all of the other supervisors.[162]  During his deposition, Moody stated that he supervised the following Supervisors:   Tony Robinson, Jermaine Bell, Ward Gonzales, Bobby Ross, Calvin Sheridan, Scott Kinley, Robert

---

156    *Id.*, at pp. 96-97
157    *Id.*, at pp. 96-97, 99-101.
158    *Id.*, at p. 98.
159    *Id.*, at p. 114.
160    *Id.*, at pp. 115-116.
161    *Id.*, at p. 200:1-25.
162    *Id.*, at p. 116.

Maginnis, and Albert Brianna.[163]  This heightened level of responsibility was reflected by the fact that Moody earned more while in this role.[164]  In fact, Moody referred to himself as an extension of the Warehouse Manager, Shadi Krishan, during this time.[165]

Moody was provided and signed a job description setting forth the primary duties and expectations for him while he filled this role.[166]  The job description lists duties including: screening candidates to fill each job within the shift he supervised; mentoring his supervisors and "[p]repar[ing] them for the next level of responsibility by cross-training them and teaching them what you do"; ensuring that the employees on his shift were paid properly; schedul[ing] employees for his shift; and being a presence on the floor "where [he] could identify issues that need[ed] to be corrected."[167]  Moody understood that this document listed what was expected of him in the position and that he, in fact, performed at least some of those duties.[168]

With respect to Moody, the Court must analyze *three* different sets of day-to-day job duties in order to determine whether or not Moody himself was properly classified as exempt.

> **b.  Two Other Opt-in Plaintiffs, Kurt Bookhardt and Jeffrey Tait, Worked as the Grocery Side and Perishable Side Managers in addition to "Supervisors."**

In addition to Moody, Opt-In Plaintiffs Kurt Bookhardt and Jeffrey Tait worked in a functional position other than as a "typical" Supervisor.  During the relevant time period, both Bookhardt and Tait performed the job duties of a manager while retaining the title of Supervisor.

---

[163]     *Id.*, at p. 148.
[164]     *Id.*, at pp. 198-200.
[165]     *Id.*, at p. 200:1-15.
[166]     *Id.*, at p. 140:20-25, Ex. 7 to Moody Depo.
[167]     *Id.*, at Ex. 7 to Moody Depo., Shift Manager Expectations.
[168]     *Id.*, at pp. 151:8-154:14.

### i. Bookhardt and Tait Worked as Inbound Supervisors.

Kurt Bookhardt worked as an Inbound Supervisor from approximately October 14, 2015 until March 14, 2016.[169]  Jeffrey Tait worked as an Inbound Supervisor from October 2012 when he transferred to the Pearl River location until March 14, 2016, at which point Tait "did [the] manager role without the title."[170]

### ii. From March 2016 and for a Period of Time, Bookhardt and Tait Worked as Essentially Co-Managers of the Inbound Shift After the Resignation of the Inbound Shift Manager.

For the Inbound Shift, the Supervisors reported to the Inbound Shift Manager.[171]  With respect to Bookhardt and Tait, during the relevant time period, Justin Bursi worked as the Inbound Shift Manager.  However, Bursi resigned and Bookhardt and Tait collectively took on his Shift Manager duties.

Bookhardt testified that his job duties changed on March 11, 2016 when Bursi resigned.[172]  At that point, Bookhardt's responsibilities expanded substantially as he essentially filled the role as "Manager."[173]  Bookhardt testified that he had "more stuff to deal with the whole operation."[174]  Bookhardt's shift would start in the office where he would complete the required paperwork and make sure that the trucks are lined up at the loading bays.[175]  He also made sure that the third party contractor, Capstone, had the paperwork that it required so that it could promptly start unloading trucks.  Bookhardt also would run the safety meeting at the beginning of each shift for the forklift drivers, and after that, he would "pretty much start running

---

[169]    Exhibit C, Bookhardt Depo., at pp. 47:17-48:8.  *See also* Exhibit P, Decl. of Floyd Baker, at ¶ 4.
[170]    Exhibit M, Tait Depo., at pp. 23:25-24:1.
[171]    Exhibit B, Decl. of Lloyd Faircloth, at 16.
[172]    Exhibit C, Bookhardt Depo., at pp. 48:13-49:18.
[173]    *Id.*, at pp. 48:13-49:18.
[174]    *Id.*, at p. 48:19-20.
[175]    *Id.*, at p. 59:1-12.

on the dock."[176]  Once he was "running on the dock," Bookhardt oversaw both the Grocery and Perishable side, including all of the forklift drivers and ensured that they carried out their duties and met company expectations.  He was also responsible for all of the Capstone employees and the Inbound Supervisors and ensured that they carried out their duties and met AWG's expectations.[177]  Bookhardt wrote up employees for safety infractions.[178]  He kept track of the employees' production during their shift.[179]  He reallocated employees from one area to another in order to keep operations moving at their expected pace.[180]  Additionally, Bookhardt was responsible for performing aisle audits to make sure that the product was put on the shelves properly.[181]  In essence, Bookhardt "ran pretty much the whole shift."[182]

Likewise, when Bursi resigned, Tait took over some of Bursi's responsibilities.[183]  As Tait testified: "I guess [I] did a manager role without the title."[184]

Moody, during his deposition, discussed Bookhardt and Tait's roles during this time period.  According to Moody, Bookhardt and Tait were supervisors that "stayed in the office."[185]  If there was an issue in the warehouse, Moody would tell Bookhardt and/or Tait "because they were the ones in the office."[186]  Bookhardt and Tait's duties were "[j]ust getting the trucks backed in and closing out paperwork,"[187] and they spent their time in the office "[e]xcept when they came out and walked the dock to see what doors they had."[188]

---

[176]   *Id.*, at p. 48:24-18.
[177]   *Id.*, at pp. 49:21-51:21.
[178]   *Id.*, at p. 52:20-22.
[179]   *Id.*, at pp. 55:25-56:2.
[180]   *Id.*, at pp. 56:25-57:12.
[181]   *Id.*, at p. 59:13-16.
[182]   *Id.*, at p. 51:7-8.
[183]   Exhibit M, Tait Depo., at p. 23:19-5.
[184]   *Id.*, at pp. 23:25-24:1.
[185]   Exhibit E, Moody Depo, at pp. 77:22-87:7.
[186]   *Id.*, at pp. 81:16-20.
[187]   *Id.*, Moody Depo., at p. 85:3-19.
[188]   *Id.*, Moody Depo., at p. 86:6-8.  Moody is referring to the primary duty of Bookhardt and Tait in assigning specific trucks for use at certain loading docks by coming out of the office to visually inspect what loading docks

Like with Moody, the Court must perform multiple analyses with respect to Bookhardt and Tait:  it must analyze their time working as Inbound Supervisors and it must separately analyze their time functionally working as Managers.  These differences further support decertification.

### c. Bobbitt Is the Only Plaintiff Who Worked as an Inventory Supervisor, Performed Different Duties, and Will Require Yet Another Individualized Analysis by the Court.

Beginning on or about March 2016, Bobbitt worked as an Inventory Supervisor.[189]  As an Inventory Supervisor, Bobbitt's job duties differed significantly from the other members of the collective.

According to Bobbitt, he spent approximately 60% of his time dealing with "problem" pallets.  There were generally two (2) types of "problem" pallets that Bobbitt dealt with.  First, there were pallets that were pre-determined to be a "problem" because upon receipt, there would be nowhere in the warehouse to house that product.[190]  In these situations, Bobbitt would have to determine the reason that the pallet was deemed a "problem" pallet which usually was one of two things:  the warehouse already had a large quantity of that product or the system did not think there was room for the pallet.[191]  Depending on the situation, Bobbitt would make recommendations to his Managers about whether to build a trailer or some type of storage

---

were empty and which were occupied.  *See also*, Exhibit L, Troyani Depo., at pp. 31-35 (describing Bookhardt and Tait as his "higher ups").  Exhibit D, Stout Depo., at pp. 45-46 (stating that Bookhardt and Tait worked in the office and would come down and help when needed).

[189]    Deposition of William Bobbitt, at p. 46:20-23; p 21:17-21 ("When John Rhodes transferred to – I believe it was Oklahoma City of Kansas City…--I was moved back into inventory control…").  A copy of the Deposition of William Bobbitt is attached as Exhibit Q.  *See also*, Exhibit P, Baker Decl. at ¶ 5 (noting that John Rhodes was transferred on or about Sept. 21, 2015).

[190]    Exhibit Q, Depo. of W. Bobbitt, at 72:10-16.

[191]    *Id.*, at 72:22 – 25.

location to hold excess product.   Typically, his Managers would agree with his recommendation.[192]

Bobbitt also had an investigatory role in his role as Inventory Supervisor.  If there was an issue with respect to damage or spilled product, Bobbitt would be provided "load numbers," and it was his responsibility to investigate who was responsible.[193]  The management team would then take that information and issue the appropriate discipline, if necessary.[194]  Further, if there were problems with a customer's order, it was Bobbitt's responsibility "to go in and start trying to figure out what happened."[195]   During his deposition testimony, Bobbitt provided the following example:  if a customer ordered 10,000 bags of potatoes, but only received 8,000, it was Bobbitt's responsibility to investigate what happened, determine why the order was short, and then report his findings to management.[196]  Bobbitt testified he spent about 40% of his time performing these kinds of tasks.[197]

As an Inventory Supervisor, Bobbitt was responsible for writing "bills of lading for items that the buyers would want to short-pick to send to stores and they would pick them up themselves."[198]  Bobbitt had the discretion to rearrange the inventory in the system in order to fulfill these orders and make sure that they were properly assembled.[199]

Further, Bobbitt was responsible for "moving all of the inventory in the system and re-slotting all of the items as well."[200]   In performing these tasks, Bobbitt was responsible for "making the new footprints"[201] for the inventory and moving the pallets.[202]

---

192  *Id.*, at p. 73-14-17.
193  *Id.*, pp. 61:24-62:17.
194  *Id.*, at p. 62:12 – 17.
195  *Id.*, at pp. 80:24-81:18.
196  *Id.*, at pp. 80:24-81:18.
197  *Id.*, at pp. 80:24-81:18.
198  *Id.*, at p. 55:7-13.
199  *Id.*, at p. 55:7-13.
200  *Id.*, at p. 58:8-10.

For a period of time as an Inventory Supervisor, Bobbitt would oversee and plan the rearranging of inventory within the warehouse[203] by supervising the forklift drivers as they ma[de] [the rearranging] happen."[204]

### 4. In addition, the Court Will Have to Determine Whether Certain Opt-In Plaintiffs Are Even Eligible to Participate in this Collective Action.

With respect to two of the Opt-In Plaintiffs, Tanya Corwin and Darrell Taylor, the Court will have to determine whether they are even eligible to participate in this collective action.  As noted above, the scope of the class conditionally certified by the Court is "all individuals employed by AWG from October 7, 2014 to the present who held the position of supervisor in AWG's Pearl River facility."[205]

With respect to Corwin, she submitted her consent to join this collective action on February 6, 2018.[206]  Accordingly, her potential recovery period is from February 6, 2015 until the end of her employment in October 2017.  Corwin was employed by AWG as a Supervisor until March 18, 2014 at which time she was terminated for walking off the job.[207]  Corwin was re-hired on July 18, 2016, but as a forklift driver, not as a Supervisor.[208]  From July 18, 2016 until her re-employment came to an end in October, 2017, Corwin was paid by the hour and received overtime.[209]  During her applicable recovery period, Corwin did not work as a Supervisor.

---

[201]  *I.e.*, discretion in laying out how the product will fit on the shelves in the warehouse. *Id.*, at p. 58:13-19.
[202]  *Id.*, at p. 58:13-14.
[203]  *Id.*, at 56:9-17.
[204]  *Id.*, at 57:18 – 23.
[205]  Rec. Doc. 56.
[206]  Rec. Doc. 26.
[207]  Exhibit P, Decl. of Floyd Baker, at ¶ 7.
[208]  *Id.*, at ¶ 8.
[209]  *Id.*, at ¶ ¶ 9-10.

With respect to Taylor, he submitted his consent to join form on April 5, 2019, and, therefore, his applicable recovery period is April 5, 2016 until the end of his employment.[210] However, during that time period, there is no record that Taylor worked at AWG's Pearl River facility.[211]  As such, and like Corwin, he is ineligible to participate in this collective action.

This is yet another separate individualized defense on which AWG will rely with respect to some, but not all, of the Plaintiffs.

## B.  Case Law Requires that this Collective Action Should be Decertified.

"Absent similarities in actual job performance, a uniform classification alone may be insufficient to meet the certification standard."[212]  All Plaintiffs can rely on is a "uniform classification," i.e., they were classified as Supervisors, which is insufficient here.  Their actual job duties as Supervisors are vastly different.

In *Johnson v. Big Lots Stores, Inc.*, a collective action consisted of store managers.[213] The Court held that the case was "not fit for adjudication as a nationwide collective action."[214] The Court noted that "[t]he more dissimilar plaintiffs' job experiences are from one another and the more individualized an employer's defenses are, the less appropriate the matter is for collective treatment."[215]  The Court, recognizing that "an analysis of the exemption/misclassification issue is highly fact intensive," went on to analyze the different exemptions at issue.

The Court started by stating that "[a] job title alone … is 'insufficient to establish the exempt status of an employee," rather "[t]he exempt or nonexempt status of any particular

---

[210]     Rec. Doc. 67.
[211]     Exhibit P, Decl. of Floyd Baker, at ¶ 11.
[212]     *Id.* at *3 (citing *Stevens v. HMSHost Corp.*, 2014 WL 4261410, at *5 (E.D.N.Y. Aug. 27, 2014)).
[213]     561 F. Supp. 2d 567 (E.D. La. 2008) (Vance, J.).
[214]     *Id.* at 568.
[215]     *Id.* at 573.

employee must be determined on the basis of whether the employee's … duties meet the requirements of the regulations."[216]  With respect to the elements of the executive exemption, the Court held that the differences in the plaintiffs' testimony and evidence regarding their job duties meant that the case could not be resolved on a representative basis.[217]

The same situation exists here:  this is not a case where the presentation of evidence from representative plaintiffs can serve as evidence for the collective action as a whole.  While all the Plaintiffs were classified as "Supervisors," they were subject to different job descriptions and engaged in different job duties.  Even those Plaintiffs who were subject to the same job description, like Bell and Kinley, provided varying testimony regarding their actual day-to-day job duties.  Indeed, with respect to the job description, Bell testified that it was inaccurate, yet Kinley testified that he performed the duties listed on the job description.[218]

Testimony from Bobbitt, who worked as an Inventory Supervisor, will do nothing to establish whether Moody was properly classified as exempt when he worked as the *de facto* "Assistant Manager" or as the Training Supervisor.  Likewise, testimony from Gonzales, regarding his day-to-day job duties as an Inbound Supervisor and as an Outbound Warehouse Supervisor is of no value to determine whether Bookhardt and Tait were properly classified as exempt when they worked as Managers.  Even within the same classification, the testimony of the Plaintiffs show that no two Supervisors are the same.  Both Bell and Kinley worked as Outbound Dock Supervisors but their testimony about their duties shows that their job duties were drastically different.  For example, Bell testified that he spent most of his time performing

---

[216]    *Id.* at 579.

[217]    *See also*, *Bradford v. CVS Pharmacy, Inc.*, 308 F.R.D. 696 (N.D. Ga. 2015) (granting motion for decertification due to differences in job duties).

[218]    Exhibit I, Bell Depo., at pp. 65:9-67:2 (stating that job description was inaccurate); Exhibit J, Kinley Depo., at pp. 37:13-44:17 (discussing job description and admitting to performing duties listed).  *See also*, Exhibit K, Robinson Depo., at pp. 43:7-46. (confirming accuracy of job description).

manual labor; Kinley testified that he did not.  Whether an employee's primary duty involves manual labor goes to the heart of the administrative exemption and a decision regarding Bell on this point is not transferrable to Kinley.  Simply put, there is no way to manage this collective in a coherent manner that will not prejudice AWG's ability to defend itself.

## C.  Fairness and Procedural Considerations Weigh Strongly in Favor of Decertification.

The third factor requires the Court to examine fairness and procedural considerations.[219] "Under this factor, the Court considers 'the primary objectives of the FLSA § 216(b) collective action: (1) to lower costs to the plaintiffs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged activity.'"[220] Additionally, in "looking at the factual disparities among Plaintiffs, the Court must consider if it can 'coherently manage the class in a manner that will not prejudice any party.'"[221] "'Indeed, a collective action is designed to permit the presentation of evidence regarding certain representative plaintiffs that will serve as evidence for the class as a whole. It is oxymoronic to use [the collective action] device in a case where proof regarding each individual plaintiff is required to show liability.'"[222]

Because the Plaintiffs are not similarly situated, fairness and procedural considerations weigh strongly in favor of decertification.  This is not a case where representative evidence can be used in order to reach a decision regarding the class as a whole.  At this stage, there is no way

---

[219]    *Snively*, 314 F. Supp. 3d at 742-43.

[220]    *Id.* at 743 (quoting *Reyes v. Texas Ezpawn, L.P.*, No. CIV.A. V-03-128, 2007 WL 101808, at *1 (S.D. Tex. Jan. 8, 2007)).

[221]    *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278, 281 (N.D. Tex. 2008) (quoting *Johnson v. TGF Precision Haircutters, Inc.*, No. CIV.A. H-03-3641, 2005 WL 1994286 (S.D. Tex. Aug. 17, 2005)); s*ee also Mahoney v. Farmers Ins. Exch.*, No. 4:09-CV-2327, 2011 WL 4458513, at *10 (S.D. Tex. Sept. 23, 2011).

[222]    *Gatewood v. Koch Foods of Mississippi, LLC*, No. 3:07CV82-KS-MTP, 2009 WL 8642001, at *20 (S.D. Miss. Oct. 20, 2009) (quoting *Bayles v. Am. Med. Response of Colorado, Inc.*, 950 F. Supp. 1053, 1067 (D. Colo. 1996)).

around the fact that each Plaintiff, multiple managers, and others from AWG will have to testify

so that the Court can reach a decision about the exemption defenses for each Plaintiff.  Because

individualized proof will be required, the objectives of collective action treatment are not

furthered by maintaining this action as a collective action.

Further complicating any trial in this collective action is the fact that many of the

Plaintiffs held more than one "position."  A perfect example of the difficulty that the Court will

face is Plaintiff Troyani.  Troyani worked both as an Inbound Supervisor and an Outbound Dock

Supervisor.[223]  However, in the last six months of his employment he switched back and forth

between the Inbound and Outbound shifts:

> [t]hat last few months it was a combination of [Outbound] shift
> and [Inbound] shift.  After, I believe, a few weeks or a month on
> [Outbound] shift, I went back to [Inbound shift], but if the
> [Outbound] shift was going too long, while I was on [Inbound
> shift] – while I was in the [Inbound] position, I would take over
> the role of putting the trucks out, getting the trucks out the door, and
> that would be a combination of both the warehouse supervisor and
> dock supervisor….[224]

As noted above, Troyani was not the only Plaintiff who held multiple roles:  six of the eighteen

Plaintiffs (or 33%) held multiple roles.  Not only will the Court need to make individualized

exemption determinations, but it will have to make multiple exemption determinations for

specific Plaintiffs during the relevant period.  This will needlessly complicate and lengthen the

trial and is inconsistent with the purposes of collective action treatment.

As shown above, the collective action should be decertified.  Due to the dissimilarities

among the Plaintiff and Opt-In Plaintiffs, the matter cannot proceed as a collective action as a

matter of law.

---

[223]      Exhibit L, Troyani Depo., at pp. 15; 13-14, 17-20 (stating that he worked as Inbound Supervisor for
approximately 1 year and then as Outbound Dock Supervisor for approximately 1.5 years).
[224]      *Id.*, at pp. 20:20-21:4.

Respectfully submitted this 1st day of October 2019.

/s/S. Mark Klyza
S. MARK KLYZA, T.A. (LA Bar #02028)
MARYJO L. ROBERTS (LA Bar #30692)
THE KULLMAN FIRM
1100 Poydras Street, Suite 1600
New Orleans, Louisiana 70163
Telephone:  (504) 524-4162
Facsimile:   (504) 596-4114
Email: smk@kullmanlaw.com
        mlr@kullmanlaw.com

ERIC R. MILLER (LA Bar #21359)
The Kullman Firm
4605 Bluebonnet Blvd., Suite A
Baton Rouge, Louisiana 70809
Telephone: (225) 906-4250
Facsimile: (225) 906-4230
Email: EM@kullmanlaw.com

**COUNSEL FOR DEFENDANT**
**ASSOCIATED WHOLESALE GROCERS INC.**