UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DE'ON MOODY ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 17-10290** |
| **ASSOCIATED WHOLESALE GROCERS, INC.** | **SECTION: "H" (4)** |

## ORDER AND REASONS

Before the Court is Defendant's Motion to Decertify Collective Action under the Fair Labor Standards Act ("FLSA") (Doc. 105). For the following reasons, Defendant's Motion is **GRANTED**.

## BACKGROUND

This is a collective action for unpaid wages under the FLSA.[1] Defendant Associated Wholesale Grocers, Inc. ("AWG") is a national food wholesaler that operates a warehouse complex in Pearl River, Louisiana as part of its distribution network. Plaintiff De'on Moody ("Moody") began working for Defendant as a selector in 2006. In this position, his job duties included loading and unloading delivery trucks and repackaging delivery pallets. The position entitled him to compensation at an hourly rate. He regularly worked overtime hours and was compensated by Defendant accordingly.

---

[1] *See* 29 U.S.C. § 201 *et. seq.*

In November 2012, Defendant promoted Moody to a supervisor position. Defendant classified the supervisor position as exempt from FLSA's overtime requirements, and Moody was compensated with a salary. Moody alleges that Defendant misclassified him as a supervisor because his "job descriptions and duties do not qualify [him] to be exempt from the FLSA overtime provisions."[2] Moody further alleges that he regularly worked overtime and is entitled to payment for that work under the FLSA.

Moody moved the Court to conditionally certify a class of "all individuals employed by AWG from October 7, 2014 to the present who held the position of supervisor in AWG's Pearl River facility."[3] The Court conditionally certified the class pursuant to the *Lusardi* approach for certification.[4] Seventeen opt-in Plaintiffs have since joined the action. Defendant argues that Moody and all other opt-in Plaintiffs were properly classified as exempt from FLSA's overtime provisions.

In the instant motion, Defendant AWG asks the Court to decertify the collective action, arguing that Moody and the seventeen opt-in Plaintiffs are not sufficiently "similarly situated" to proceed with the collective action. Defendant asserts that Plaintiffs are not similarly situated for four reasons: (1) the job duties for the different types of supervisors differ to the extent that a decision about one type's FLSA exemption cannot provide the basis for a decision about a different type; (2) even within a single type of supervisor role, the duties differed among those supervisors to a degree that would impact the analysis as to each Plaintiff's exempt status; (3) some of the Plaintiffs performed unique or special job duties during the relevant period; and (4) some

---

[2] Doc. 14 at 4.
[3] Doc. 35 at 2.
[4] Doc. 56; *see also* Lusardi v. Werox Corp., 118 F.R.D. 351 (D.N.J. 1987).

Plaintiffs may be ineligible to participate in the collective action.[5] AWG argues that, because of the significant differences among the Plaintiffs' primary duties, an individualized analysis will be necessary to assess the Plaintiffs' FLSA-exempt status, rendering a collective action inappropriate.[6] The Court agrees.

## LEGAL STANDARD

The FLSA generally provides that employers must pay their employees one and a half times their regular rate of pay for all hours worked in excess of forty per week.[7] However, employers do not have to pay overtime wages to individuals "employed in a bona fide executive, administrative, or professional capacity."[8] To qualify for one of these exemptions, an employee's "primary duty" must be the performance of exempt work.[9] The exemptions "constitute affirmative defenses to overtime pay claims," and the employer bears the burden of proving that an employee is properly classified as exempt.[10]

The FLSA provides a cause of action for employees to recoup improperly denied overtime wages.[11] The FLSA further allows for one or more employees to bring such a claim on their own behalf and on behalf of others who are "similarly situated" in the form of a collective action.[12] The FLSA does not define what it means for employees to be "similarly situated."

---

[5] Doc. 105-1 at 5.
[6] *Id.* at 2.
[7] 29 U.S.C. § 207(a)(1).
[8] *Id.* § 213(a)(1). The FLSA does not provide the necessary criteria to qualify for one of these exemptions; instead, "it delegates authority to the Secretary of Labor to promulgate rules that define these exemptions." Johnson v. Big Lots Stores, Inc., 561 F. Supp. 2d 567, 572 (E.D. La. 2008).
[9] 29 C.F.R. § 541.700(a).
[10] *Johnson*, 561 F. Supp. 2d at 572.
[11] 29 U.S.C. § 216(b).
[12] *Id.*

Courts have utilized two methods for determining whether plaintiffs are similarly situated, commonly referred to as the *Lusardi* approach and the *Shushan* approach.[13] The Fifth Circuit has not determined whether either approach is required.[14] The Eastern District of Louisiana, however, has consistently applied the approach first articulated in *Lusardi v. Werox Corp.*[15] This approach uses a two-step analysis. First, at the "notice stage," the court determines whether notice should be given to potential members of the collective action, "usually based only on the pleadings and any affidavits."[16] Because the court has little evidence at this stage, "this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class."[17]

If the court grants conditional certification, the case proceeds as a collective action through discovery.[18] After discovery, the defendant may move for decertification.[19] At that point, the court makes a factual inquiry, with the benefit of considerably more information, as to whether the employees are similarly situated.[20]

Under the *Lusardi* approach, courts apply a three-factor test to determine whether plaintiffs and potential members of the collective action are

---

[13] *Compare* Shushan v. Univ. of Colorado, 132 F.R.D. 263 (D. Colo. 1990) *with* Lusardi v. Werox Corp., 118 F.R.D. 351 (D.N.J. 1987).

[14] *See* Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1216 (5th Cir. 1995) ("We find it unnecessary to decide which, if either, of the competing methodologies should be employed in making an ADEA class certification decision."), *overruled on other grounds*, Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 (2003).

[15] *See, e.g.*, Smith v. Offshore Specialty Fabricators, Inc., No. 09-2985, 2009 WL 2046159, at *2 (E.D. La. July 13, 2009); Xavier v. Belfor USA Grp., Inc., 585 F. Supp. 2d 873, 876 (E.D. La. 2008); *Johnson*, 561 F. Supp. 2d at 569.

[16] *Mooney*, 54 F.3d at 1213–14.

[17] *Id.* at 1214.

[18] *Id.* at 1213–14.

[19] *Id.*

[20] *Id.*; *Xavier*, 585 F. Supp. 2d at 878.

4

similarly situated. The factors include: "(1) the extent to which the employment settings of employees are similar or disparate; (2) the extent to which any defenses that an employer might have are common or individuated; and (3) general fairness and procedural considerations."[21] "The more dissimilar plaintiffs' job experiences are from one another and the more individuated an employers' defenses are, the less appropriate the matter is for collective treatment."[22] "[T]he burden is on the plaintiff to prove that the individual class members are similarly situated."[23]

## LAW AND ANALYSIS

### I. The Exemptions

Because AWG asserts that Plaintiffs "were properly classified as exempt pursuant to the executive exemption, administrative, and the combination exemptions,"[24] this Court must consider the Plaintiffs' job duties in light of the aforementioned exemptions. The Court will first provide a brief overview of the pertinent exemptions.

### A. Executive Exemption

To qualify as an executive, an employee must (1) be paid on a salary basis at least $684 per week; (2) have management of the enterprise as his or her "primary duty;" (3) "customarily and regularly" direct the work of two or more other employees; and (4) have the authority to hire or fire other employees or make recommendations about hiring, firing, advancement, promotion or any

---

[21] *Johnson*, 561 F. Supp. 2d at 573.
[22] *Id*.
[23] Snively v. Peak Pressure Control, LLC, 314 F. Supp. 3d 734, 739 (W.D. Tex. 2018).
[24] Doc. 105-1 at 6.

5

other change of status of other employees that are given "particular weight."[25] Only the latter three requirements are at issue in this case.

### 1. Management as a Primary Duty

A "primary duty" is the principal, main, major, or most important duty performed by the employee, based on all the facts and with an emphasis on the character of the employee's job as a whole.[26] The amount of time spent performing exempt work can be a useful guide to determine whether such work is the employee's "primary duty."[27] While time alone is not the sole test to determine primary duties, an employee who spends more than fifty percent of his or her time performing exempt work will generally satisfy the "primary duty" requirement. However, concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the statutory requirements are otherwise met.[28]

Exempt management activities include directing the work of employees; maintaining production records for use in supervision or control; appraising employees' productivity and efficiency for the purposes of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; controlling the flow and distribution of materials or merchandise and supplies; and providing for the safety and security of the employees or the property.[29]

### 2. Customarily and Regularly Directing the Work of Two or More Employees

---

[25] 29 C.F.R. § 541.100.
[26] *Id.* § 541.700(a).
[27] *Id.* § 541.700(b).
[28] *Id.* § 541.106(a).
[29] *Id.* § 541.102.

6

An executive employee must customarily and regularly direct the work of two or more employees. "Customarily and regularly" requires something more than occasional but may be less than constant; it includes work normally and recurrently performed every workweek.[30] The requirement of "two or more employees" contemplates two full-time employees or their equivalent.[31] An employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence does not meet this requirement.[32]

### 3. Authority to Hire or Fire or Make Recommendations with Particular Weight

An executive employee must have the authority to hire or fire other employees. Alternatively, the executive employee's recommendations as to hiring, firing, promoting, or advancement must be given "particular weight." To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency of suggestions; and the frequency with which the employee's suggestions and recommendations are relied upon.[33] It does not include an occasional suggestion with regard to the change in status of a co-worker.[34]

## B. Administrative Exception

To qualify as an exempt administrator, the employee must (1) be paid on a salary basis of not less than $684 per week; (2) have the primary duty of office work or non-manual work directly related to management or general operations of the employer; and (3) exercise discretion and independent

---

[30] *Id.* § 541.701.
[31] *Id.* § 541.104(a).
[32] *Id.* § 541.104(c).
[33] *Id.* § 541.105.
[34] *Id.*

judgment with respect to matters of significance when engaged in primary duties.[35] Only the latter two requirements are at issue in this case.

   1. *Office Work or Non-Manual Work Related to Management or General Operations as a Primary Duty*

The primary duty of an administrative employee must be office work or non-manual work directly related to management or general operations. Work is "directly related to the management or general business operations" if it assists with the running or servicing of the business.[36] This includes work in functional areas such as auditing; quality control; purchasing; procurement; safety and health; personnel management; human resources; computer network, internet and database administration; legal and regulatory compliance; and similar activities.[37]

   2. *Discretion and Independent Judgment on Matters of Significance*

An exempt administrative employee's primary duty must consist of exercising discretion and independent judgment on matters of significance. The employee must have the "authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level."[38] Exercising discretion and independent judgment "must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals."[39] It does not include "clerical or secretarial work, recording or

---

[35] *Id.* § 541.200.
[36] *Id.* § 541.201(a).
[37] *Id.* § 541.201(b).
[38] *Id.* § 541.202(c).
[39] *Id.* § 541.202(e).

8

tabulating data, or performing other mechanical, repetitive, recurrent or routine work."[40]

Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee provides consultation or expert advice to management; and whether the employee investigates and resolves matters of significance on behalf of management.[41]

### C. Combination Exemptions

Finally, an employee may be exempt from the FLSA's overtime requirements if he or she falls under the "combination exemption." This exemption is for "[e]mployees who perform a combination of exempt duties as set forth in the regulations . . . for executive [and] administrative . . . employees."[42]

## II. Analysis

For this suit to continue as a collective action, the Court must determine that the Plaintiffs are similarly situated after considering the extent to which the Plaintiffs' job duties are similar or disparate, whether AWG would be required to deploy individualized defenses, and any fairness or procedural concerns.

---

[40] *Id.*
[41] *Id.* § 541.202(b).
[42] *Id.* § 541.708.

9

### A. Similarities and Differences in Job Duties

For a collective action to properly function as an efficient procedural mechanism, the testimony of a handful of plaintiffs must be representative of all opt-in plaintiffs' experiences. Here, Plaintiffs argue that their actual, day-to-day responsibilities render them misclassified. Thus, the testimony of some Plaintiffs as to their day-to-day duties—which will speak to any applicable exemptions—must be representative of the entire class of opt-in Plaintiffs. If the testimony of some Plaintiffs establishes that an exemption may be applicable to them, while the testimony of other Plaintiffs establishes the opposite, it can hardly be said that they are "similarly situated." Indeed, such a situation would, in the context of a collective action, place the Court in the precarious position of properly granting relief to some while improperly granting relief to others, or properly denying relief to some while improperly denying relief to others.

Both parties agree that all Plaintiffs held the position of "Warehouse Supervisor" while employed at AWG. Plaintiffs argue that, in addition, each of them worked under the same managerial structure, was compensated under the same compensation plan, held "essentially the same position with the same responsibilities and job duties," and suffered from the same policy of misclassification by AWG.[43] Essentially, Plaintiffs argue that "[t]hey differed only in where they were assigned to work in the warehouse."[44] Plaintiffs describe the extent of these differences as "whether an employee is [responsible for] unloading pallets or loading pallets."[45]

---

[43] Doc. 115 at 2, 5.
[44] *Id.* at 6.
[45] *Id.* at 8.

Defendant argues that, rather, there were different types of Warehouse Supervisors, each with their own unique set of duties and responsibilities: Inbound Supervisors, Outbound Warehouse Supervisors, and Outbound Dock Supervisors.[46] Further still, Defendant argues that even within a specific type of supervisor role—such as the Outbound Dock Supervisor position—the testimony of Plaintiffs reveals that their duties greatly differed.[47]

According to Defendant, Inbound Supervisors were responsible for instructing trucks on where to dock; supervising the unloading process for accuracy, efficiency, and cleanliness; meeting with taggers and forklift drivers at the beginning of each shift to debrief safety and quality issues; and performing audits of pallets for accuracy and quality.[48] Outbound Warehouse Supervisors were responsible for supervising forklift drivers; coordinating forklift work to prevent stocking issues; and reallocating resources to resolve problems that arose when items went out of stock.[49] Outbound Dock Supervisors were responsible for meeting with loaders at the beginning of each shift to handout assignments; overseeing loaders for efficiency, safety, and quality; resolving problems brought to them by loaders; closing out loads by auditing pallets for proper wrapping and quality conditions; coordinating moving trucks to the staging yard; and making sure loaders cleaned up after the shift.[50]

Plaintiff asserts that these are mere "distinct semantic labels" and that each Plaintiff "performed essentially the same functions."[51] According to Plaintiff, these purported differences in job duties:

---

[46] Doc. 105-1 at 5.
[47] *Id.*
[48] *Id.* at 7–10.
[49] *Id.* at 11–12.
[50] *Id.* at 13–14.
[51] Doc. 115 at 8.

boil down to this: they, the Plaintiffs, start their shifts at different times; their handling or placement of product differs; the productivity of employees and the location where they worked differs; the titles of the employees they worked alongside differs; the information used during their shifts, and the quality control measures for each section all differed.[52]

The Court disagrees. The differences outlined by the Defendant are more significant. For example, there is no evidence that Outbound Warehouse Supervisors conducted audits of product for quality control purposes—a factor that favors the administrative exemption.[53] On the other hand, ample evidence suggests that Inbound Supervisors and Outbound Dock Supervisors conducted audits of product.[54]

But even if the Court agreed with Plaintiffs that the differences in duties were more so a result of location than actual function, testimony of the Plaintiffs reveals that, in practice, their day-to-day duties differed significantly. These reported differences in duties speak directly to the defenses available to AWG at trial.

**B. AWG's Individualized Defenses**

AWG plans to use the administrative, executive, and combination exemptions as a defense against Plaintiffs' unpaid overtime claims at trial. If AWG cannot deploy the same defense(s) against each Plaintiff, then a collective action is inappropriate, as the Plaintiffs would not be sufficiently "similarly situated."

AWG presented the deposition testimony of numerous Plaintiffs, demonstrating that their self-reported duties were, in fact, disparate—and

---

[52] Doc. 115 at 7.
[53] Plaintiffs claim, in a chart summarizing the Defendant's proffered job descriptions, that Outbound Warehouse Supervisors *did* "perform audits of outgoing pallets to confirm order accuracy and look for damage," but they fail to cite to any evidence in the record for this claim. *See id*. at 8.
[54] *See id*. at 7–8; *see also* Doc. 105-1 at 8–10, 13–14.

significantly, that different defenses would therefore have to be used. For example, for AWG to properly deploy the administrative exemption defense, the primary duty of the employee must be office work or non-manual work directly related to management or general operations. In the context of a collective action, if AWG can deploy that defense against any one opt-in Plaintiff, AWG should be able to properly apply that defense against all others. However, that is not the case here.

Plaintiff Jermaine Bell testified that as an Outbound Dock Supervisor, his primary duty consisted of loading trucks and getting trucks loaded by others.[55] He further testified that he was one of the only supervisors who would load trucks.[56] Sometimes he would load trucks for three to four hours in a single shift; other times he would spend the entire shift loading trucks.[57] On the other hand, Plaintiff Scott Kinley testified that as an Outbound Dock Supervisor, he rarely loaded trucks, approximating the activity at less than ten percent of his time.[58] He further testified that shortly after he started in this position, he was instructed that he was not allowed to load trucks, so he stopped and never did after that.[59] In fact, he described his main duty as "paperwork basically."[60] Finally, Plaintiff Albert Troyani testified that in his entire time as an Outbound Dock Supervisor, he loaded trucks only five or six times ever.[61] Because the primary duty of an administrative employee must be non-manual work, AWG could theoretically deploy the administrative exemption defense against Plaintiffs Kinley and Troyani but not against Bell.

---

[55] Doc. 105-10 at 52–53.
[56] *Id.* at 5–6.
[57] *Id.* at 12.
[58] Doc. 105-11 at 27–28.
[59] *Id.*
[60] *Id.* at 34.
[61] Doc. 105-13 at 22.

13

Thus, the result is AWG being forced to deploy individuated defenses—something antithetical to a collective action.

As explained in a similar case:

> At a high level of generality opt-in plaintiffs' job duties may be similar in that they are subject to a uniform job description, are required to run [their sections] according to corporate policies, and are supervised by . . . managers. But in terms of individual job duties, the evidence shows that the opt-in plaintiffs have different responsibilities from one another and that individuals [within the same functional position] will have different duties . . . . Such diversity in individual employment situations inhibits [AWG] from proving its statutory exemption defense[s] as to all [seventeen] opt-in plaintiffs on the basis of representative proof. And, because the plaintiffs are dissimilar, the Court cannot confidently adjudicate plaintiffs' claims or [AWG's] defense on the merits.[62]

Thus, while Plaintiffs argue that the differences in their duties are more so a matter of location than function, it is clear that the differences in duties result in the inevitable conclusion that AWG's defenses will not be applicable to all Plaintiffs. As explained below, this would unfairly prejudice both Defendant and Plaintiffs.

### C. Fairness and Procedural Concerns

Under this final factor, the Court must consider the primary objectives of FLSA's collective action procedural mechanism: "(1) to lower costs to the plaintiffs through the pooling of resources, and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged activity."[63] However, the Court must also consider "whether it can coherently manage the class in a manner that will not prejudice any party."[64]

---

[62] *Johnson*, 561 F. Supp. 2d at 578–79.
[63] *Snively*, 314 F. Supp. 3d at 743.
[64] *Id.*

First, the Court notes that if the collective action was permitted to proceed, then prejudice to the parties is certain. In this case, the Plaintiffs' "job responsibilities vary along the critically-important axis of exempt . . . duties recognized by the regulations."[65] Therefore, AWG "cannot be expected to come up with 'representative' proof [of a proper exemption] when the plaintiffs cannot reasonably be said to be representative of each other."[66] Furthermore, if AWG were to hypothetically successfully defend against one Plaintiff's claim on the basis of an exemption, this would be to the detriment of other Plaintiffs who would not otherwise fall under an exemption.

Second, the Court notes that the Plaintiffs have already benefitted from the "pooling of resources" by virtue of the Court's earlier granting of conditional collective action status. The Plaintiffs have had the benefit of pooling resources up to and through the discovery stage of litigation. While decertification of this suit could result in eighteen separately-filed and tried actions, this pales in comparison to other decertification outcomes.[67]

## CONCLUSION

Accordingly, Defendant AWG's Motion to Decertify Collective Action is **GRANTED**. The Court **DECERTIFIES** this collective action, and the claims of all opt-in Plaintiffs are **DISMISSED WITHOUT PREJUDICE**.

---

[65] *Johnson*, 561 F. Supp. 2d at 582.
[66] *Id.* at 587.
[67] *See Johnson*, 561 F. Supp. 2d at 587 (where court decertified a class of over 900 opt-in plaintiffs only after a full-blown trial on the merits).

New Orleans, Louisiana this 14th day of November, 2019.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**